ROBERT BRUCE VOTAW, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Votaw v. Commissioner
Docket No. 25666-88
United States Tax Court
T.C. Memo 1989-550; 1989 Tax Ct. Memo LEXIS 548; 58 T.C.M. (CCH) 344; T.C.M. (RIA) 89550; October 10, 1989
Robert Bruce Votaw, pro se. Thomas J. Travers and Jeri L. Gartside, for the respondent. NAMEROFF
MEMORANDUM FINDINGS OF FACT AND OPINION NAMEROFF, Special Trial Judge: This case was assigned pursuant to the provisions of section 7443A(b) of the Internal Revenue Code. [1] (By Order dated June 5, 1989, the Court granted petitioner's motion to remove the small tax case designation and to process this case as a regular Tax Court case.) Respondent determined a deficiency of $ 1,601 in petitioner's 1986 Federal income tax. Respondent also determined that petitioner was liable for an addition to tax under section 6653(a)(1)(A) in the amount of $ 80.05 and under 6653(a)(1)(B) in the amount of 50 percent of the interest due on the portion of the underpayment attributable to negligence. [2] The issues we are to decide are: 1) whether petitioner is entitled to a deduction for employee *550 business expenses in any amount; and 2) whether petitioner is liable for the additions to tax for negligence. Some of the facts have been stipulated and are so found. Petitioner resided in Redondo Beach, California at the time of the filing of the petition. Petitioner claimed head of household status on his 1986 Federal income tax return. Itemized deductions claimed on petitioner's return consisted of the employee business expenses at issue herein and $ 699 for taxes paid. In 1986, a head of household taxpayer was entitled to a "zero bracket amount" of $ 2,480. Sections 1(b)(3), 1(f), and 63(d). In order to take advantage of itemized deductions, petitioner's deductions would have to exceed that zero bracket amount. Accordingly, in order for petitioner to deduct any employee business expenses as claimed, the total would have to exceed $ 1,781 ($ 2,480 less $ 699) in order to receive any tax benefit from those *551 deductions. During the taxable year 1986, petitioner was employed as a public relations player (sometimes referred to as a "prop") at the Horseshoe Club (the Club) in Gardena, California, a draw poker parlor. During 1986, the Club conducted two different types of poker games. One type was called the "round game" in which a maximum of eight players were permitted to play at a table and for which the Club did not provide a dealer. The players at a round game paid a fee for the right to play at the table, which ranged from $ 6.00 to $ 7.50 per half hour, depending upon the minimum stakes involved. An employee of the Club circulated among the tables every half hour and collected the fee from each player. The other form of game was called the "jackpot game," for which the Club did provide a dealer. Players at the jackpot game could win the regular pot, which consisted of wagers made by the players, and the jackpot, which was paid by the Club. No table fees were paid directly by the players to the Club for the privilege of playing in the jackpot games. However, the Club obtained its table fee by having the dealer withdraw $ 3.00 from each pot. In addition, the dealer would withdraw *552 $ 1.00 from the initial ante of each pot that went into a separate "drop box" for purposes of building up the jackpot. Petitioner was a salaried employee of the Club. During 1986, he worked the "graveyard shift" five days per week from 10:00 p.m. to 6:00 a.m. The function of a public relations player is to insure that there are a sufficient number of players at a table in order to have a legitimate game. The round game required at least six players. Petitioner's job was to play poker at the Club during working hours. Petitioner played with his own money. Petitioner's winnings were his own and his losses were not reimbursed by the Club. The majority of the games at the Club were round games, and the Club's primary emphasis was to fill the round games. In the round games, the desired number of players was eight. Petitioner would be assigned to a round game if there were six or fewer players at the table. As soon as there were seven other players at the table, petitioner was reassigned to play at another round game. If there was no such need to fill in at a round game, petitioner was then assigned to a jackpot game. If petitioner was playing at a round game when collection of *553 the table fee was made, petitioner, like every other player, was required to pay the $ 6.00 table fee. In addition to receiving a salary from the Club, petitioner was entitled to and was reimbursed for his table fees. In 1986, petitioner worked at the Club 1,728 hours and had wages of $ 15,905. In addition, he received reimbursements of his table fees from the Club in the amount of $ 20,374.50. (The includability and deductibility of these table fees are not at issue in this case.) These reimbursements were based upon petitioner submitting to his supervisor on a weekly basis a "props daily collection record," on which petitioner listed the daily amount of table fees he had paid. (Petitioner stated that he only included round table fees in this report, as he was unaware that he could claim any reimbursement from jackpot games.) These records were initialed by his supervisor and turned in to the Club's payroll office. An employee from the payroll office of the Club testified that petitioner could have also claimed reimbursement for the costs he incurred while participating in the jackpot games. The fees incurred by petitioner in the jackpot games were minimal at best. Petitioner's *554 1986 return reflected wages from the Club of $ 15,905 and an employee business expense of $ 15,905, which petitioner deducted as an itemized deduction. When petitioner had his 1986 return prepared, he advised his preparer that he had suffered a very bad year financially and had incurred substantial expenses, whereupon the preparer entered the sum of $ 15,905 on petitioner's return as an itemized deduction for miscellaneous nonreimbursed employee business expenses. This entry was made notwithstanding petitioner's failure to maintain records of any sort reflecting his activities and expenses at the Club. Petitioner claims that he incurred various business expenses as an employee of the Club as explained below. 1) Jackpot fees. Every time petitioner played in a jackpot game, $ 1.00 out of the first ante from all players went into a special drop box for purposes of building up the jackpot. Generally, there were six players at a jackpot game and petitioner claims that one-sixth of that dollar constitutes an employee business expense. Petitioner further estimates that 20-30 percent of his time was spent in the jackpot game and, on average, ten hands were played each hour. Petitioner *555 also stated that frequently he would pay the round game table fee and then be sent to a jackpot game when an eighth player arrived at a round game. Thus, petitioner believes that he may have spent more than 20-30 percent of his playing time in jackpot games. 2) As indicated above, the Club received $ 3.00 out of every pot as its table fee in the jackpot game. Petitioner estimated that an average player should win one of six pots (assuming six participants). Therefore, assuming ten hands played per hour, the frequency and amount of the $ 3.00 table fee could be reasonably computed. 3) It was customary for a winning player to tip the dealer. While petitioner was under no obligation to tip the dealer, he believed that he would quickly lose his job if he did not comply with this custom. Accordingly, every time he won a pot, petitioner would tip the dealer 50 cents. 4) Each night, when petitioner would cash in his chips at the cashier's window, he would tip the cashier $ 1.00. Petitioner again stated that this practice was customary for players (and particularly props) and that failure to comply with this custom would result in his dismissal. 5) Twice during each shift, the floor *556 man for the round games would change the deck of cards being used at a round game table. It was customary for winners to contribute up to $ 5.00 from every winning pot until $ 30.00 to $ 40.00 was accumulated per table. This money would be given to the floor man, who would share some of this money with the ushers and other individuals who tended to the players' comfort needs. 6) Frequently, at the end of a shift, petitioner decided to continue playing at the Club after he had clocked out. Apparently, this normally occurred when he had a particularly poor night and desired to try to recoup his gambling losses. On such occasions, petitioner would incur additional table fees at both round games and jackpot games. Petitioner claims that such expenses were also deductible employee business expenses. As a public relations player, petitioner was required to gamble with his own money. He was entitled to keep his winnings and, of course, had to suffer his own losses. Petitioner agrees that neither his bets nor his gambling losses constitute business expenses. Petitioner testified that his gambling activities were very unsuccessful throughout 1986 resulting in the loss of virtually *557 all of his savings. Nevertheless, petitioner contends that the amount claimed on his return for expenses did not include gambling losses. As noted above, petitioner maintained no contemporaneous books and records reflecting any of his activities at the Club. Deductions are a matter of legislative grace, Colonial Ice Co. v. Helvering, 292 U.S. 435 (1934), and are not allowable unless Congress has specifically provided for them. Determinations by respondent are presumed correct, and petitioner has the burden of proof of overcoming that presumption. Welch v. Helvering, 290 U.S. 111 (1933); Rule 142(a). Accordingly, petitioner must prove by a preponderance of the evidence that he incurred specific amounts of expenses that are deductible under a provision of the Internal Revenue Code. On this record, petitioner has failed to establish that he incurred any expenses in carrying on his business as a prop. Even if we were to hold that certain items might be deductible, petitioner has not shown that he incurred sufficient expenses to overcome the zero bracket amount threshold. It is clear that the amounts paid by petitioner while he was an employee *558 for table fees at the round game are not involved in this case. Petitioner was entitled to obtain a reimbursement of his round game table fees and did in fact receive $ 20,751 in reimbursements. Similar fees incurred by petitioner while he was not an employee of the Club, however, are no different than fees incurred by any other nonemployee patron of the Club for the privilege of playing in a card game. They are nondeductible personal expenditures. Section 262. Accordingly, round game table fees incurred by petitioner after he clocked out are not deductible. Petitioner stated that $ 1.00 out of each initial ante in each jackpot game went to the jackpot. However, the jackpot could be won by a player only upon his receipt of a certain poker hand. Accordingly, the $ 1.00 per pot was nothing more than another bet, notwithstanding its mandatory nature, and petitioner could have been a jackpot winner like any other player. Accordingly, petitioner's share of each $ 1.00 initial ante would not be a deductible business expense. The $ 3.00 table fee that the Club withdrew from each jackpot game pot was only withdrawn from the wagers made by the game's players. Therefore, we view this *559 table fee merely as a reduction from the amount won by a player in a jackpot game rather than as an expense of playing the game. More importantly, in view of petitioner's testimony that he lost a substantial amount of money during 1986, it follows that his share of winning jackpot game pots was substantially less than average. Nevertheless, even if this $ 3.00 table fee were an unreimbursed business expense, we have no basis upon which to estimate the number of jackpot game pots that petitioner won and from which he was obligated to pay $ 3.00 to the Club in playing fees. [3]
The balance of petitioner's *560 claims pertain to the 50-cent tips made to the dealer on each winning hand, the "up to $ 5.00" in tips made to the floor men on each winning pot, and the $ 1.00 tips made to the cashier each night for cashing petitioner's chips. It is possible that these items constitute ordinary and necessary expenses in the trade or business of being a prop, but we need not decide that at this time. Suffice it to say that the amounts substantiated with regard to the cashier could not have exceeded $ 300, and the amounts paid to the dealers and floor men from winning pots necessarily had to be small because of petitioner's testimony that he had a very bad year and did not win many pots. Accordingly, we cannot find that petitioner incurred deductible business expenses in excess of $ 1,781. We sustain respondent on this adjustment. Section 6653(a)(1)(A) imposes an addition to tax of 5 percent of the underpayment if any part of an underpayment is due to negligence or intentional disregard of rules and regulations. In addition, section 6653(a)(1)(B) imposes an addition to tax of 50 percent of the interest payable on that portion of the underpayment attributable to negligence. Petitioner bears the *561 burden of proving that the additions determined in respondent's notice of deficiency do not apply. Bixby v. Commissioner, 58 T.C. 757, 791 (1972). Petitioner maintained no books and records of any of his activities. As a result, petitioner has obviously commingled any small amounts of expenses he may have had with his large gambling losses. We do not think this is the act of a reasonably prudent person. We sustain respondent's determination for the additions to tax for negligence. To reflect the above, Decision will be entered for respondent. Footnotes
1. Unless otherwise indicated, all section references are to the Internal Revenue Code of 1986 in effect for the year at issue. All Rule references are to the Tax Court Rules of Practice and Procedure.↩
2. The notice of deficiency refers to sections 6653(a)(1) and 6653(a)(2). However, those designated sections were replaced by sections 6653(a)(1)(A) and 6653(a)(1)(B), respectively, in the Tax Reform Act of 1986, section 1503(a), Pub. L. 99-514, 100 Stat. 2742.↩
3. In addition, petitioner's table fee reimbursements totalled $ 20,374.50 for 1,728 hours of work, an average of $ 11.72 per hour. This average nearly equates to the $ 6.00 per half hour required to be expended at the cheapest of the round games, to which petitioner was usually assigned. Even if he had to move to jackpot games shortly after paying a round game fee, there does not appear to be a substantial amount of time available to play in jackpot games, and certainly nothing anywhere near the amount of time necessary to accumulate the size of fees claimed by petitioner.↩